**David MICHAELS, Plaintiff,**

**v.**

**AMBASSADOR GROUP INC., Arnold Chait, Doris June Chait, Edward C. Chait, Daniel Hirsch, Esq., Joseph S. Maresca, Douglas M. Auster, Jay Wells, Richard A. Tafro and Coopers & Lybrand, a corporation, Defendants.**

**No. CV 84–2455.**

United States District Court, E.D. New York.

April 4, 1986.

Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants Ambassador Group Inc., Arnold Chait, Doris June Chait, Edward C. Chait, Joseph S. Maresca & Douglas M. Auster.

Reavis & McGrath, New York City, for defendant Hirsch.

Hughes, Hubbard & Reed, New York City, for defendant Coopers & Lybrand.

Robinson, Silverman, Pearce, Aronson & Berman, New York City, for defendant Wells.

Golenbock, Eiseman, Assor & Bell, New York City, for defendant Tafro.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This proposed class action is one of the many lawsuits that have emerged from the collapse of the Ambassador Group, Inc. ("Ambassador") an insurance holding company.[1] In this litigation, Ambassador stockholder David Michaels is the sole named plaintiff in a lawsuit against defendants Ambassador, Ambassador's former officers and inside directors,[2] and Coopers & Lybrand, Ambassador's accountants. Michaels alleges that defendants violated § 10(b) of the federal securities law, 15 U.S.C. § 78j(b), 78t, Rule 10(b)(5), and state common law when they artificially inflated the price of Ambassador stock by failing to make a full disclosure of the company's financial condition. Michaels seeks to represent the class of persons who purchased Ambassador common stock between April 1, 1980 and November 10, 1983.[3] Plaintiff now moves for class certification, Rule 23(c)(1) Fed.R.Civ.P. For the reasons stated below, the motion is granted and the class is certified.

## FACTS

Ambassador, a Delaware corporation with its principal place of business in New Jersey, is an insurance holding company with two principal operating subsidiaries, Ambassador Insurance Company, Inc. ("AI"), which is licensed in Vermont, and Horizon Insurance Company, Inc. ("Horizon"), which is licensed in New York. Am-

---

1. In addition to the instant case, Ambassador's demise has precipitated four other lawsuits: *Bard v. Quaif*, Civ.D–17472 (Sup'r Ct. Fulton Cty. Ga. filed Feb. 26, 1985); *Bard v. Chait*, 85 Civ. 2441 (D.N.J. filed May 21, 1985); *Corcoran v. Ambassador Group*, Index No. 85/28414 (Sup.Ct. N.Y.Cty. commenced Nov. 1, 1985); and *National Union Fire Insurance Co. v. Ambassador*, 85 Civ. 2132 (E.D.N.Y. filed June 11, 1985).

2. Named as defendants are Arnold Chait, Doris June Chait, Edward C. Chait, Daniel Hirsch, Joseph Maresca, Douglas Auster, Jay Wells, and Richard Tafro.

3. The proposed class excludes all defendants, members of their immediate families, and any subsidiary in which any defendant had a controlling interest.

bassador was incorporated in 1971. Since 1976 it had paid cash dividends consistently and, at least since 1974, it had shown steady growth in net income. In its 1982 Annual Report, issued in May, 1983, Ambassador reported a loss of $7.1 million, the first in its history. The Report attributed the loss to "reserve strengthening," and indicated that there would be a prompt return to profitability because loss reserves, which are maintained as a contingency funds against reported or incurred claims, were now fully funded and therefore the company would not have to divert moneys from profits.

In March 1983, the Vermont Department of Banking and Insurance began an investigation of AI, Ambassador's Vermont subsidiary. On November 10, 1983, just six months after Ambassador's 1982 Annual Report, David Bard, the Vermont Commissioner of Insurance, was appointed Receiver in Rehabilitation of AI because its liabilities apparently exceeded assets by $20 million. Approximately one month later, Horizon, Ambassador's New York subsidiary, was placed in receivership by James Corcoran, the New York State Commissioner of Insurance. Ambassador's stock, which is traded over the counter under the NASDAQ quotation system, and had ranged as high as 14⅜ in 1982, plummeted to 1¼. A report by the Vermont Receiver in Rehabilitation indicated that Ambassador had misrepresented its loss reserves and that Ambassador's September 30, 1983 quarterly statement understated its liabilities by almost $45 million.

For the purposes of this motion, the following facts are also relevant. David Michaels, the sole named plaintiff, graduated from a New York City public high school, is a licensed auctioneer, and used to own a candy store. Michaels is active in the stock market, but apparently possesses no special knowledge or expertise in stocks or the ways of the stock market. Michaels' information about stocks and the market comes from many sources. He speaks with his broker, reads newspapers, consults various financial publications such as Standard & Poors "tear sheet," and converses with his family members, friends, and acquaintances about stocks, companies, and the market in general. He does not follow any particular investment strategy, but will employ a variety of strategies and often makes his buying and selling decisions depending upon particular market situations. In some instances, Michaels will buy a stock after extensive research and lengthy deliberation; in others, he makes a rapid judgment based on instinct or a hunch.

Michaels first became aware of Ambassador in 1983 when he learned from Steve Torrin, a friend, that Torrin owned stock in Ambassador. Michaels then examined Standard & Poors's June 8, 1983 "tear sheet" on Ambassador, which revealed, among other things, that Ambassador had earned 11¢ per share in the first quarter of 1983 and would soon declare a dividend. Shortly thereafter, Michaels again encountered Torrin, who had just attended Ambassador's 1983 annual meeting. Torrin told Michaels that at the meeting, Arnold Chait, Ambassador's president, had spoken optimistically of Ambassador's financial state. Michaels also learned from Torrin that, according to Chait, Ambassador's 1982 loss stemmed largely from the company's decision to increase its cash reserves. This one-time diversion of profits would create a fully-funded contingency against future claims. At Michaels' request, Torrin supplied a copy of Ambassador's 1982 annual report. Michaels spent about half an hour reading the 29 page report from cover to cover. Michaels also read Ambassador's financial report for the first quarter of 1983. Based on his conversations with Torrin and the two documents, Michaels concluued that Ambassador was a possible "turnaround" stock.[4] Michaels purchased

---

**4.** In stock parlance, a "turnaround" describes a stock that is essentially profitable, but is selling currently at lower than usual prices because of recent, and hopefully temporary, financial setbacks. The stock price is expected to increase or "turnaround" as the company passes through the period of financial reverses and returns to its earlier pattern of profitability.

2000 shares of Ambassador stock at 7¼ on July 20, 1983.

Michaels now moves to certify a class consisting of all persons who purchased Ambassador common stock between April 1, 1980 and November 10, 1983. The Complaint alleges that during 1979, 1980, and 1981, a time when Ambassador's financial statements showed a growing net income, defendants deliberately understated the company's loss reserves—the amount of money Ambassador would or could owe its insured on reported or incurred losses—in order to project a more favorable picture to stockholders and potential investors. The Complaint also alleges that defendants deliberately concealed information about Ambassador's operations and management. With respect to Coopers & Lybrand, Michaels alleges that the accountants were aware of several accounting irregularities and insufficient loss reserves, yet failed to report them and gave "clean" opinions of Ambassador's financial condition.

## DISCUSSION

Rule 23(a), Fed.R.Civ.P. states that:

One or more members of a class may sue or be sued as representative parties of all only if:

1. the class is so numerous that joinder of all members is impracticable,
2. there are questions of law or fact common to the class;
3. the claims or defenses of the representative parties are typical of the claims and defenses of the class, and
4. the representative parties will fairly and adequately protect the interests of the class.

■ The Court begins its analysis of the class certification motion by noting that certification is generally favored in this Circuit in the context of a § 10(b) action. *Green v. Wolf Corporation*, 406 F.2d 291, 295 (2d Cir.1968) *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969);

*Greene v. Emersons Ltd.*, 86 F.R.D. 47, 53–59 (S.D.N.Y.1980). Given the broad liability under § 10(b) for misrepresentation of material information, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); and the flexibility accorded the trial court to structure, restructure, or decertify a class of plaintiffs, Rule 23(c)(4), Fed.R.Civ.P., *Green v. Wolf Corporation*, 406 F.2d at 298, there is a preference for certifying a class action brought under § 10(b).

■ With respect to the size of the class, the Court finds that the first test is satisfied easily. Ambassador's own SEC filing indicated that the company had approximately 530 stockholders. Although plaintiff does not know the exact number of stockholders during the class period, that number may approach 1000.[5]

■ Turning then to the second element of Rule 23(a), the Court is also satisfied that there are questions of law and fact common to the class. In this case, the common questions include whether, over the course of three years, defendants misrepresented Ambassador's financial condition in the annual or quarterly reports, and whether defendants knew or should have known the reports were untrue or contained material omissions. *Blackie v. Barrack*, 524 F.2d 891, 902–03 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) (citations omitted). The Court also concludes that questions of law or fact common to the class predominate over any individual questions. Rule 23(b)(3), Fed.R.Civ.P.

■ The third element of Rule 23(a), typicality, is also met by class plaintiff Michaels. Defendants argue that Michaels is atypical of the class because he is subject to unique defenses. Specifically, defendants contend that Michaels did not rely on the integrity of the market because he was fully aware of Ambassador's deteriorating

---

5. Of the 3,841,000 outstanding shares, 2,471,778 or 68% are owned jointly by defendants Doris and Arnold Chait, 25,000 are owned by defendant Joseph Maresca, and 7,000 are owned by Daniel Hirsch. Therefore, approximately 1.3 million shares or ⅓ are held by the class members.

financial situation and speculated that Ambassador was a "turnaround" situation. First, use of a "turnaround" strategy will not, in and of itself, make Michaels atypical in a § 10(b) action so long as he relied on the integrity of the market. In any event, the evidence does not indicate that Michaels made his purchase on speculation or was fully aware of Ambassador's precarious financial state. Rather it reveals that he was exposed to at least two alleged misrepresentations showing that Ambassador's fortunes would improve. Like other investors, plaintiff shares an interest in the truth of statements disseminated by management when those statements form the impetus for his purchase of stock. *Blackie,* 524 F.2d at 905. Second, Michaels is not atypical merely because he followed no set investment strategy, employed a strategy different from other investors, or acted quickly after he learned about developments affecting Ambassador. *Peil v. Speiser,* 97 F.R.D. 657, 659–60 (E.D.Pa. 1983); *Weiss v. Drew National Corporation,* 71 F.R.D. 429, 430–31 (S.D.N.Y.1976).

Defendants also contend that Michaels is atypical because he is a "sophisticated investor" or "market player," *i.e.* that he possessed special information about the market or did not rely on market information. The record does not indicate that Michaels is a sophisticated investor or had any special knowledge about Ambassador. *Compare Lewis v. Johnson,* 92 F.R.D. 758, 760 (E.D.N.Y.1981) (class certification denied when named plaintiff was a sophisticated investor). Although Michaels initially learned about the stock from a friend, Michaels' research consisted of reviewing the company's financial history (as reported in the widely disseminated Standard & Poor's "tear sheet"), reading the Company's Annual Report, and hearing, from Torrin, remarks made at the annual meeting by Arnold Chait. Michaels does not become a "sophisticated investor" or "player" merely because he spends a good deal of his time watching stocks at his broker's office, discusses the stock market with his friends at a tennis club, or learns about a particular stock from a friend who

is also a shareholder. Furthermore, even if Michaels was more sophisticated than the typical Ambassador shareholder, this does not render him atypical with respect to his position as class representative because he may have relied unwittingly on the same misrepresentations that may also have induced other investors to buy the stock. If the defendants perpetrated a fraud on the market, then even the most sophisticated investor would be deceived. *See Leist v. Tamco,* 34 Fed.R.Serv.2d 1424, 1427 (S.D. N.Y.1982); *Wilson v. Great American Industries,* 94 F.R.D. 570, 572 (N.D.N.Y. 1982). *See also Blackie v. Barrack,* 524 F.2d at 905 ("Differences in sophistication, etc., among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each purchaser identically.")

Defendants argue next that Michaels is atypical because his interests conflict with the rest of the class. The conflict arises supposedly because Ambassador stockholders who purchased early in the class period but sold their stock shortly after Michaels made his purchase will seek to establish that their selling price reflected the true market value of the stock, while Michaels, as class plaintiff and a late purchaser, will attempt to prove that at the time he bought the stock, its value was still inflated by defendants' misrepresentations. It is well-established, however, that any such conflict between early and late purchasers will not be sufficient to deny a motion for class certification if all the misrepresentations relied upon are interrelated or part of a common scheme to defraud. *See Green v. Wolf Corporation,* 406 F.2d 291, 300 (2d Cir.1968). In this case, the Complaint alleges that throughout the entire class period, defendants misrepresented or concealed Ambassador's financial weaknesses, management problems, and insufficient loss reserves. Any conflict of interest arising from different times of purchase and sale is minimal when compared to the substantial questions common

to all members of the class. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y.1981); *Kane Associates v. Clifford*, 80 F.R.D. 402 (E.D.N.Y.1978); *Markewich v. Adikes*, 76 F.R.D. 68 (E.D.N.Y.1977). Furthermore, any conflict between class members and Michaels would also be present among the class as a whole and only involves issues of damages, not liability. *Simon v. Westinghouse Corp.*, 73 F.R.D. 480, 484–85 (E.D.Pa.1977). If, as defendants allege, a conflict would arise with respect to damages, then this Court retains the power to divide the class into various sub-classes based on date of purchase or sale, shorten the class period, or require additional named plaintiffs. Rule 23(c)(4), Fed.R.Civ.P. At this stage of the litigation, these conflicts are too peripheral to mandate denial of the class certification motion. *Green v. Wolf Corporation*, 406 F.2d at 300.

 The Court also concludes that the fourth element of Rule 23(a), adequacy, is satisfied here. An important element of adequate representation is that the class plaintiffs' attorney is competent to conduct the proposed litigation. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968) ("*Eisen* II"). The Court notes, based on counsel's appearances before the Court in this and other matters, that plaintiff's law firm will provide vigorous and competent prosecution of the lawsuit. A second element that must be satisfied is whether the class plaintiff possesses an interest antagonistic to that of the class. *Eisen* II. Defendants contend, however, that Michaels will not be an adequate class representative for three reasons.

First, defendants contend that Michaels is inadequate because he is unfamiliar with the action. The Court rejects this conten-

tion. First, defendants have selectively lifted nine separate statements from Michaels' deposition that supposedly demonstrate his "gross" unfamiliarity with the lawsuit. A complete reading of Michaels' deposition reveals a class plaintiff who is able to recount fully the history of his decision to invest in the Company and can identify the information disseminated by defendants that forms the basis for the complaint. Michaels' deposition testimony demonstrates consistently that Michaels is aware that his lawsuit depends on being able to prove that defendants concealed or failed to reveal Ambassador's management problems and false reporting of loss reserves.[6]

 Even if the parties cannot agree on Michaels' knowledge of the lawsuit, it is clear to this Court that Michaels' familiarity with the litigation meets the requirements of Rule 23(a)(4). *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966). The law does not require the named plaintiff to possess an extensive knowledge of federal securities laws, *Lewis v. Curtis*, 671 F.2d 779 (3d Cir.1982), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144; *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 103 (S.D.N.Y.1981), or even complete familiarity with all of the particulars of the pending lawsuit. *Grossman v. Waste Management Inc.*, 100 F.R.D. 781, 790 (N.D.Ill.1984). It is enough that the class representative is aware of the basic facts underlying the lawsuit as alleged in the complaint and does not abdicate his obligations to fellow class members.

 Defendants also argue that Michaels is an inadequate class representative because he is unwilling to bear the costs of litigation if they exceed $20,000 and then

---

**6.** The Court also notes a possible contradiction between defendants' earlier charge that Michaels was atypical because he was a "sophisticated investor" and the instant argument that Michaels is "woefully unfamiliar with the facts purportedly underlying this action." The defendants' image of Michaels as an atypical "sophisticated market player," fully aware of Ambassador's financial state and making invest-

ment decisions based on "unique investment ¬¬rategies" and "extraordinary sophistication," does not square fully with defendants' portrayal of Michaels as largely unfamiliar with the facts and circumstances giving rise to his claim. The Court suggests that Michaels' level of knowledge and sophistication is somewhere between these two extremes.

only if plaintiff's counsel indicates that the lawsuit is proceeding successfully. The ability and willingness of class plaintiffs to finance a lawsuit are pertinent factors in the determination of whether named plaintiffs are adequate representatives of the class. If the lawsuit is not financed adequately, then it probably cannot be prosecuted vigorously. *Burger v. CPC International Inc.*, 23 Fed.R.Serv.2d 1015, 1017 (S.D.N.Y.1976); *National Auto Brokers Corp. v. General Motors Corp.*, 376 F.Supp. 620, 637 (S.D.N.Y.1974), *aff'd* 572 F.2d 953 (2d Cir.1978). Because plaintiff must bear, among other things, the cost of notice to the class, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178–79, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1973) ("*Eisen IV*"), then the question becomes whether Michaels' willingness to pay at $20,000 will cover at least the cost of notice to the class. *See Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir.1978), *aff'd* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). In this case, plaintiffs state, and defendants do not dispute, that the cost of notice to the class will probably not exceed $2,000. The other major expense will be expert's fees. Plaintiff's attorneys will not advance any funds for accounting and other experts. Plaintiff points out, however, that these expenses will probably not exceed $10,000, but, in any event, if the action concludes successfully, then these costs will be paid out of a settlement or judgment. *See, e.g., Seigal v. Merrick*, 619 F.2d 160, 166–67 (2d Cir.1980); *Shore v. Parklane Hosiery Co.*, 67 A.D.2d 526, 415 N.Y.S.2d 878 (2d Dep't 1979) (expert witness fee agreements found proper and not in violation of disciplinary rules). The Court is persuaded, therefore, that there are sufficient resources to finance the litigation.

Defendants also contend that inconsistencies in Michaels' deposition testimony reflect negatively on his credibility and adequacy as a class representative. Taken as a whole, however, the inconsistencies are peripheral and do not prove a serious question of Michaels' credibility. Although the Court should examine a class plaintiff's credibility and include it in the class certification calculus, *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir.1981), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982), this case is quite unlike the cases cited by defendants, *Kline v. Wolf*, 702 F.2d 400 (2d Cir.1983) and *Cohen v. Laiti*, 98 F.R.D. 581 (E.D.N.Y.1983), where there were serious contradictions in the deposition testimony of class plaintiffs. Inconsistencies in Michaels' deposition testimony will neither burden the class by diverting attention away from the substance of the claims, nor raise a serious question about Michaels' credibility and desire to prosecute the lawsuit vigorously.

Therefore, the Court concludes that plaintiff has satisfied the elements of Rule 23(a). This does not, however, end the inquiry. Michaels must also satisfy the requirements of Rule 23(b)(3).[7] The Court has already concluded that the first part of Rule 23(b)(3) is satisfied because common issues of law or fact predominate. The remaining inquiry is whether a class action is a superior means of adjudication. After considering the factors enumerated in Rule 23(b)(3), the Court concludes that a class action is a superior means of adjudication.

7. Rule 23(b)(3), Fed.R.Civ.P., states that:
 (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 ....
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With respect to each of the factors listed in Rule 23(b)(3):

(A) Individual control of separate actions is not preferable to maintenance of a class action because of the large number of plaintiffs and the relatively small size of each claim. *Eisen* IV, 417 U.S. at 161, 94 S.Ct. at 2144;

(B), (C) Although there are other lawsuits against the Company, and its officers and directors arising out of the collapse of Ambassador, the Court is unaware of any other lawsuit brought by or against Ambassador shareholders.[8] Therefore, there is no other forum readily available for the resolution of these stockholder claims. This Court may also be the most appropriate forum because of the presence of a related interpleader action, *National Union Fire Insurance Co. v. Ambassador, et al*, 85 Civ. 2132 (E.D.N.Y. filed June 11, 1985);

(D) Finally, the Court concludes that management difficulties do not preclude certification of a class action. If the Court decides to create subclasses, then the use of split trials can simplify issues of liability with respect to when a plaintiff bought or sold Ambassador stock and what information affected their market decision. *Green v. Wolf Corporation*, 406 F.2d at 301. Once liability issues are settled, the court may refer damage questions to a Magistrate, 28 U.S.C. § 636, or a special master, Rule 53, Fed.R.Civ.P.; *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969) for resolution. Finally, as the Court noted earlier, there is no financial barrier to the giving of notice to the class members.

## CONCLUSION

Accordingly, for the reasons stated above, plaintiff's motion for class certification is granted and the class is certified. Within thirty (30) days of this order, plaintiff is directed to submit to the Court a proposed form of class notice.

SO ORDERED.

8. See footnote 1.